[No. F062160. Fifth Dist. Mar. 10, 2014.]

LINDA ADAMS et al., Plaintiffs and Appellants, v.
MHC COLONY PARK LIMITED PARTNERSHIP et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified
for publication with the exception of parts I., II., IV., V.B., V.C., V.D., V.E., VI. and VII. of the
Discussion.

COUNSEL

Endeman, Lincoln, Turek & Heater, Henry E. Heater, James C. Allen and Linda B. Reich for Plaintiffs and Appellants.

Horvitz & Levy, Mitchell C. Tilner, Steven S. Fleischman; Robie & Matthai, Michael J. O'Neill, Craig W. Brunet; and Kenneth A. Kroot for Defendants and Respondents.

OPINION

**FRANSON, J.**—More than 80 residents of a 186-space mobilehome park sued the owner for failing to properly maintain the park's physical improvements and common facilities, including the park's sewer system, water pressure, electrical system, and matters related to security such as street lighting. The residents pursued claims for nuisance, breach ·of contract and negligence. After a 43-day jury trial, the jury found in favor of only six residents.

The losing residents filed this appeal, asserting instructional error, inconsistent special verdicts, and the erroneous exclusion of impeachment evidence.

We conclude that (1) the jury's findings that there were substantial failures to maintain the park's improvements, that did not affect a substantial number of people, can be reconciled with the jury's findings that there were no breaches of contract; (2) while erroneous, the instruction regarding the elements of a public nuisance was not prejudicial; (3) the purportedly erroneous instruction on the elements of a private nuisance claim caused no harm because the jury decided the private nuisance claims without reaching the disputed elements; (4) the trial court erred by concluding the park's rules and regulations were unambiguous and allowed the park to rent spaces for recreational vehicles;[1] and (5) the trial court did not abuse its discretion when it prohibited the use of a questionnaire for impeachment purposes because the questionnaire had not been produced during discovery.

We therefore reverse the judgment and remand for further proceedings on the claims that the park's owner rented spaces for recreational vehicles.

---

[1] For convenience, this opinion uses the shorthand phrase ˙renting spaces for recreational vehicles (and variants that use rent or rental of) to refer to Colony Park renting spaces to persons who intend to place a recreational vehicle on the lot in a manner not explicitly authorized by the park's rules. For example, living in a recreational vehicle placed on a lot, whether or not hooked up to utilities, is not explicitly authorized.

## FACTS

Appellant Linda Adams and over 80 other former and current residents of a mobilehome park named Colony Park Estates and located in Ceres, California (the Park), sued the owners and operators of the Park. They alleged the Park's improvements and common facilities had not been properly maintained. Only six of the plaintiffs obtained favorable verdicts and were awarded damages.

The appellants are Linda Adams and 62 other residents who did not prevail at trial. Unless the context indicates otherwise, the appellants are referred to as the "plaintiffs."

Equity Lifestyle Properties, Inc.,[2] is the parent company of the entities named as defendants in this lawsuit. The named defendants include (1) MHC Colony Park Limited Partnership, doing business as Colony Park Estates; (2) MHC Colony Park, L.L.C.; (3) MHC Financing Limited Partnership Two; and (4) MHC-QRS Two, Inc. The limited partnerships are the current or former owners of the Park and the two other entities are their general partners. For purposes of the verdict, the named defendants stipulated that they could be treated as one entity. In this opinion, we will refer to these entities as "defendants" or "Colony Park."

In this appeal, plaintiffs have not challenged the sufficiency of the evidence supporting the special verdicts or raised other issues that require a detailed description of the evidence presented at trial. Consequently, we will provide only a brief overview of the positions presented by the parties during the trial.

Plaintiffs contended that the Park was not properly maintained over the past 10 years. As to the Park's sewer system, plaintiffs supported their position by referring to (1) citations issued by the California Department of Housing and Community Development (HCD) from 2001 through 2005; (2) testimony of an inspector for HCD whose first experience with the Park was a sewage spill in the 1990's; and (3) the testimony of many of the plaintiffs regarding their experiences with the system. Plaintiffs also challenged defendants' handling of abandoned mobilehomes and their maintenance of the Park's water system, electrical system, and common areas and facilities.

Defendants' theory of this case is that it was filed because the residents of the Park were unhappy with a rent increase. Defendants contend that after the notices of rent increase were sent in November 2005, the residents began to

---

[2] In *Manufactured Home Communities, Inc. v. County of San Diego* (9th Cir. 2011) 655 F.3d 1171, the court stated this entity was formerly known as Manufactured Home Communities, Inc., and was a real estate investment trust based in Chicago that owned and operated mobilehome parks throughout the United States. (*Id.* at p. 1173.)

picket and advocate for the adoption of rent control. Defendants note the absence of written complaints about conditions at the Park before the rent increase was announced, their own policy of promptly acting on complaints by residents, and the increase in vandalism to the Park's sewer system after the rent increase was announced.

In short, the parties held very different views about whether problems existed, the severity of the problems, and the source of some of the problems—particularly whether residents vandalized the sewer system in retaliation for the increase in rent.

## PROCEEDINGS

Plaintiffs filed this action on December 1, 2006. The operative pleading is the first amended complaint (FAC), which included causes of action for nuisance, breach of contract, negligence, intentional interference with property rights, and various other claims. The FAC did not include claims for misrepresentation or fraud.

In the nuisance cause of action, plaintiffs alleged that defendants maintained a nuisance "by substantially failing to maintain the Park's common areas, facilities, and physical improvements in good working order and condition . . . ." The alleged failures to maintain concerned the sewer system, the water system, drainage, the electrical system, the streets within the Park, lighting and other security measures, the gas delivery system, the laundry facilities, the swimming pool, and other facilities. Plaintiffs also alleged that the Park's manager violated the Park's rules. Based on the alleged failures to maintain and violations of the Park's rules, plaintiffs asserted that "defendants created and maintained both a private and a public nuisance at common law and under Civil Code section 798.87."

The lawsuit was tried before a jury in August, September and October of 2010. On Thursday, October 14, 2010, the testimony of the last witness was presented. The court directed the jury to return the following Tuesday for instructions and final arguments.

On Friday, October 15, 2010, the trial court and counsel worked on the jury instructions. That afternoon, the court went on the record and stated: "I think for the most part we've reached an agreement [on] how we're going to instruct this jury." The court stated its understanding that plaintiffs were going to proceed on causes of action for public and private nuisance, breach of contract and negligence, which plaintiffs' counsel confirmed.

The morning of Tuesday, October 19, 2010, prior to closing arguments, counsel for plaintiffs submitted a handwritten proposed jury instruction to the

trial court regarding an implied contractual duty to maintain the Park's facilities and improvements in good working order and condition. Additional facts relevant to the untimeliness of this proposed instruction are discussed in the unpublished portion of this opinion.

Counsel's arguments to the jury were completed at the end of the day on Friday, October 22, 2010. The jury was directed to complete a "Special Verdict for Public Nuisance" (some capitalization omitted) and 47 special verdict forms for the claims of the individual plaintiffs for breach of contract, private nuisance and negligence.

As to the public nuisance claim, the jury found there was "a substantial failure by Colony Park to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition." However, the jury also found the substantial failure did *not* affect a substantial number of people at the same time. On the second basis for the public nuisance claim, the jury found there was no substantial violation by Colony Park of the Park's rules and regulations. Therefore, plaintiffs obtained no monetary or injunctive relief under their public nuisance claim.

The special verdict forms for the claims of the individual plaintiffs contained 19 questions—three for breach of contract claims, eight for private nuisance, three for negligence, and five questions concerning damages. Only 47 special verdict forms were needed for the 72 plaintiffs because the forms addressed the claims relating to a single rental space and, in many instances, two or three plaintiffs lived together.

The jury found in favor of Joyce and Richard Avana (the Avanas) on their claim for private nuisance. Joyce Avana and her son Richard rented space 16. During closing argument, plaintiffs' attorney asserted that the sewer records showed backup after backup in the Avanas' home during 2004, 2005 and 2006. The attorney requested $40,497 in damages for overpayment of rent and $16,325 for loss of use and enjoyment. He also asserted: "To repair the home of the damage that's been done by the park is $17,143." The jury awarded $10,000 in damages for the cost of repair or replacement. No other damages were awarded.

The jury also found in favor of Erika and Alfonso Barragan (the Barragans), who rented space 61, on their claim for private nuisance. During closing argument, the attorney asserted (1) the sewer backed up into their home causing them to spend $2,500 to replace the flooring and (2) the unit did not get sufficient amperage because of problems with the electrical pedestal connected to their unit. The jury found that the Barragans suffered $16,275 in

economic damages[3] and that Erika Barragan suffered $15,000 in noneconomic damages. In addition, the jury apportioned 25 percent of the fault to Erika, 25 percent to Alfonso, and 50 percent to defendants.

The jury found in favor of Milagro and Israel Cermeno (the Cermenos) on their negligence claim. The Cermenos rented space 75A. During closing argument, plaintiffs' attorney mentioned the problems the Cermenos had with flushing their toilet and slow drainage, though no sewage spills occurred inside their home. Counsel also mentioned problems with low water pressure and electrical service, maintenance of the laundry room, access to the fitness room, and rats infesting their home after a nearby abandoned home was demolished. The jury found the Cermenos incurred $4,200 in economic damages and Milagro Cermeno suffered $10,000 in noneconomic damages.

As to the claims of the remaining 66 plaintiffs, the jury found in favor of defendants.[4] On December 20, 2010, the trial court filed a judgment that implemented the jury's special verdicts.

Plaintiffs then filed a timely motion for new trial or, in the alternative, for judgment notwithstanding the verdict. The motion asserted (1) instructional error regarding the elements of public nuisance; (2) inconsistent special verdicts regarding public nuisance and breach of contract; (3) inconsistency between the finding of no public nuisance and the findings of nuisance with respect to the Avanas, the Barragans and the Cermenos; and (4) insufficiency of the evidence to justify the verdict. The trial court denied plaintiffs' motion.

The trial court also decided posttrial issues concerning costs and attorney fees and implemented its decision in an amended judgment filed on February 7, 2012. As to the 66 plaintiffs who went to verdict and did not prevail, the amended judgment stated they were jointly and severally liable for $1,975,543.33 in attorney fees and other costs. As for the two plaintiffs dismissed for nonsuit, the amended judgment stated the estates of Nancy and Walter Faughn were jointly and severally liable for approximately $1.5 million of the fees and costs awarded. In total, the amended judgment resolved the claims of 82 plaintiffs—eight never got to trial because a terminating sanction led to their dismissal, two were nonsuited, six won at trial, and 66 lost as a result of jury verdicts against them. Further details about the amended judgment are provided in the unpublished portion of the opinion.

---

[3] The jury awarded $0 for overpayment of rent; $7,775 for loss of use and enjoyment of home, and $8,500 for cost of repair or replacement. During closing argument, plaintiffs' attorney requested $40,497 for overpayment of rent; $14,508 for loss of use and enjoyment; and $20,466 for the cost of fixing the home.

[4] Two of the plaintiffs, the estates of Nancy Faughn and Walter Faughn, did not obtain a jury verdict because their claims were dismissed for nonsuit during the trial.

Only 63 of the 66 plaintiffs who lost as a result of jury verdicts have pursued this appeal. The plaintiffs who won at trial—the Avanas, the Barragans and the Cermenos—did not appeal.

## DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. *Jury Instructions Regarding Public Nuisance*

#### A. *Rules of Law Concerning Public Nuisance*

##### 1. *Common Law Public Nuisance*

■ In 1872, the California Legislature codified a number of common law principles regarding nuisance. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1104 [60 Cal.Rptr.2d 277, 929 P.2d 596].) The Legislature defined a nuisance in Civil Code section 3479 as anything that is "injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . . ." A nuisance qualifies as a *public nuisance* when it "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.) The concept of a private nuisance includes all those nuisances not covered by the definition of public nuisance (Civ. Code, § 3481) and also includes some public nuisances. (47 Cal.Jur.3d (2010) Nuisances, § 27, p. 303 [nuisance may be both public and private under certain circumstances].) In other words, it is possible for a nuisance to be public and, from the perspective of individuals who suffer an interference with their use and enjoyment of land, to be private as well. (*Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 160 [24 Cal.Rptr.2d 607].)

A private nuisance cause of action requires the plaintiff to prove an injury specifically referable to the use and enjoyment of his or her land. (*Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 302 [84 Cal.Rptr.3d 75].)

---

*See footnote, *ante*, page 601.

█ The remedies for a public nuisance are (1) indictment or information (i.e., a criminal proceeding); (2) a civil action; or (3) abatement. (Civ. Code, § 3491.) In contrast, the remedies for a private nuisance are limited to a civil action or abatement. (Civ. Code, § 3501.)

### 2. Public Nuisance Under the Mobilehome Residency Law

In 1982, the Legislature enacted Civil Code section 798.87. (Stats. 1982, ch. 1392, § 2, p. 5306.) The current version provides:

"(a) The substantial failure of the management to provide and maintain physical improvements in the common facilities in good working order and condition shall be deemed a public nuisance. Notwithstanding Section 3491, this nuisance may only be remedied by a civil action or abatement.

"(b) The substantial violation of a mobilehome park rule shall be deemed a public nuisance. Notwithstanding Section 3491, this nuisance may only be remedied by a civil action or abatement."[9]

The foregoing failures and violations, despite being deemed public nuisances, may be remedied only by a civil action or abatement. (Civ. Code, § 798.87, subds. (a) & (b).) Thus, unlike common law public nuisances, they may not be remedied in criminal proceedings. Subdivision (c) of Civil Code section 798.87 states that a civil action under this section may be brought by a park resident, park management, or a district or city attorney.

The Legislative Counsel's Digest described the statute as providing "that both the failure of the management of a mobilehome park to provide and maintain physical improvements in the common facilities in good working order and condition and the violation of a mobilehome park rule *are nuisances as specified*." (Legis. Counsel's Dig., Assem. Bill No. 1324 (1981–1982 Reg. Sess.) 6 Stats. 1982, Summary Dig., p. 504, italics added.)

### B. Contentions of the Parties

Plaintiffs' FAC alleged that "defendants created and maintained both a private and a public nuisance at common law and under Civil Code section 798.87." Plaintiffs asserted they presented a revised set of proposed instructions that included a proposed instruction defining a public nuisance in two separate ways—the first based on the statutory criteria of Civil Code section

---

[9] A 1983 amendment added the word "substantial" to Civil Code section 798.87, subdivisions (a) and (b). (Stats. 1983, ch. 187, § 1, p. 631.) Proponents of this amendment asserted it would prevent the use of the new law for the smallest of infractions and would discourage frivolous lawsuits.

798.87 and the second based on the common law elements codified in Civil Code section 3479. Plaintiffs contend that the trial court erroneously instructed the jury on the law of public nuisance by conflating the two theories into a single instruction and special verdict form. In plaintiffs' view, the jury should have been allowed to find a statutory public nuisance existed based solely on the criteria in Civil Code section 798.87, which was drafted specifically to address situations arising in mobilehome parks, and should not have been required to find additional elements pertaining to a common law public nuisance.[10]

Defendants counter plaintiffs' contention by asserting that (1) plaintiffs agreed to the public nuisance instruction and, thus, their challenge is barred by the doctrine of invited error or waiver; (2) the public nuisance instructions were correct; and (3) the instructional error, if any, was harmless.

### C. *Instructional Error*

■ Based on the mandatory language in Civil Code section 798.87— "shall be deemed a public nuisance"—and the legislative history, which includes the summary in the Legislative Counsel's Digest that refers to "nuisances as specified," we conclude that the substantial failure to maintain described in subdivision (a) of Civil Code section 798.87 and the substantial violation of park rules described in subdivision (b) constitute public nuisances that can be proved without the need to show the additional elements of a common law public nuisance.

A contrary reading of the statute would mean that the Legislature did not expand the existing remedies available to park residents, but actually narrowed available remedies, as the newly described public nuisances may not be addressed in criminal proceedings. Nothing in the legislative history presented to this court indicates that the Legislature thought the common law formulation of public nuisance was too broad when applied to mobilehome parks and, therefore, needed to be restricted. To the contrary, the legislative history indicates that the existing rules regarding public nuisance were not adequate and special rules were needed to address problems peculiar to mobilehome parks.

■ Therefore, we agree with plaintiffs that the instructions and the special verdict form for public nuisance contained legal error in that they

---

[10] Under this theory of error, plaintiffs assert that the jury should not have been asked the fourth and fifth questions in the special verdict for public nuisance. The fourth question asked whether the substantial failure to provide and maintain improvements and facilities "affect[ed] a substantial number of people at the same time." The jury answered that question "No," and did not reach the fifth question.

added elements of a common law public nuisance to the two types of public nuisance created by subdivisions (a) and (b) of Civil Code section 798.87.

█ In addition, the instructions and verdict form contained an additional misstatement of law because they did not track the language in subdivision (a) of Civil Code section 798.87, which refers to "substantial failure of the management to provide and maintain physical improvements *in* the common facilities in good working order and condition." (Italics added.) Because of the limiting effect of the prepositional phrase "in the common facilities," the statutory provision does not extend to physical improvements that are not part of the "common facilities."

In comparison, the instructions and verdict forms referred to "a substantial failure by Colony Park to provide and maintain the physical improvements of the Park *and* the common facilities in good working order and condition." (Italics added.) By changing the statute's "in" to the word "and," the trial court expanded the statutory language so that the instructions included all physical improvements, whether or not they were "in the common facilities."

Plaintiffs did not raise this second instructional error in their papers and, at oral argument, confirmed that they were not pursuing it. We have described the failure to track the statutory language here because that error affects how the jury's answers in the special verdicts are interpreted. Specifically, if the correct wording had been used, then the jury's answers to the question in the special verdict for public nuisance about substantial failures to maintain would have indicated a problem that involved the common facilities. Instead, the jury's "yes" answer to that question may have been based on failures to maintain physical improvements on particular lots that had no impact on any common facility.

## D. *Demonstrating Prejudice from Instructional Error*

Not all instructional errors require reversal and a new trial. To obtain a reversal, an appellant must establish that the error was prejudicial.

### 1. *Rules of Law Governing Appellate Inquiry into Prejudice*

Article VI, section 13 of the California Constitution provides that "[n]o judgment shall be set aside, or a new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the

entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."[11]

■ The California Supreme Court has interpreted the "miscarriage of justice" phrase as prohibiting a reversal unless there is "a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Thus, when challenging the jury instructions given in a civil case, the appellant must show it was "reasonably probable the jury would have returned a more favorable verdict." (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1073 [119 Cal.Rptr.3d 878].)

The California Supreme Court also has provided guidance for applying the constitutional requirement for "an examination of the entire cause" (Cal. Const., art. VI, § 13) when assessing prejudice from instructional error. Insofar as relevant, courts should consider (1) the degree of conflict in the evidence on the critical issues; (2) whether the winning side's argument to the jury may have contributed to the instruction's misleading effect; (3) whether the jury requested rereading of the erroneous instruction or related evidence; (4) the closeness of the jury's verdict; and (5) the effect of other instructions in remedying the error. (*Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 570–571.) Stated more succinctly, the assessment "requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled." (*Id.* at p. 574.)

An appellate court's responsibility to conduct "an examination of the entire cause" (Cal. Const., art. VI, § 13) is triggered "when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [87 Cal.Rptr.2d 754].) These principles are derived from the axiom that prejudice is not presumed and the burden is on the appealing party to demonstrate that prejudice has occurred. (*Id.* at p. 105.)

---

[11] This constitutional provision has a statutory parallel: "No judgment . . . shall be reversed . . . by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error . . . or defect had not occurred or existed." (Code Civ. Proc., § 475.)

## 2. *Argument Regarding Prejudice*

In their opening brief, plaintiffs simply argued that they "clearly were prejudiced by this error" in the instructions regarding public nuisance. By relying on this conclusory assertion of prejudice, plaintiffs (1) failed to articulate the more favorable result that they believe would have been achieved in the absence of the instructional error and (2) failed to analyze the factors (i.e., the evidence, counsel's argument, the other instructions and special verdicts) that are used to assess whether that more favorable result was a reasonable probability.

Therefore, plaintiffs' opening brief failed to carry their burden of affirmatively demonstrating the existence of a *prejudicial* error. (See *Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 403 [153 Cal.Rptr.3d 21] ["fundamental rule of appellate review is that the appellant must affirmatively show *prejudicial* error"].)

Defendants' opposition brief raised the question of prejudice by contending that plaintiffs would have lost even if the purported instructional error did not exist. Plaintiffs' reply brief responded with the following argument: "[Defendants] overlook the fact that there was substantial evidence in the record to support a verdict in favor of [Plaintiffs]. Indeed, the jury did find in the special verdict that [Defendants] had substantially failed to maintain the Park in good working order and condition. They found a nuisance per se under Civil Code section 798.87. [Plaintiffs] could have used that verdict to seek injunctive repairs. The jury could have used that verdict to find a private nuisance and award damages."[12]

This argument at least addresses the starting point of a prejudice analysis by identifying the more favorable results that plaintiffs believe they would have achieved in the absence of the alleged instructional error. First, plaintiffs assert they had a reasonable probability of obtaining an injunction requiring repairs. Second, plaintiffs assert they would have been able to obtain damages.

## 3. *Possibility of Injunctive Relief*

Here, the jury found that (1) regarding the claim of a public nuisance, the substantial failure or failures to maintain did not affect a substantial number

---

[12] Generally, appellate courts will consider an argument raised for the first time in a reply brief only if the appellant presents a good reason for failing to present the argument earlier. (*Lister v. Bowen* (2013) 215 Cal.App.4th 319, 336–337 [155 Cal.Rptr.3d 50].) Here, plaintiffs have not presented a good reason for failing to analyze prejudice in their opening brief. This failure represents a separate and independent ground for our rejection of their claim that the instruction on the elements of a public nuisance constituted reversible error.

of people at the same time; (2) regarding the private nuisance claims of each of the unsuccessful plaintiffs, there was no substantial failure by defendants to provide and maintain physical improvements or common facilities in good working order and condition; and (3) a substantial failure to maintain occurred only as to the Avanas, the Barragans and the Cermenos—the successful plaintiffs who rented spaces 16, 61 and 75, respectively. As to the Cermenos, the jury found that the substantial failure to maintain did not cause them harm. Thus, the Cermenos did not prevail on their private nuisance theory, but prevailed on their negligence claim.

These explicit findings by the jury lead us to conclude that the substantial failures to maintain physical improvements or common facilities in good working order and condition that were the basis of the jury's answer to the first question in the special verdict on public nuisance affected only the Avanas and the Barragans and *did not affect any of the plaintiffs pursuing this appeal.*

Defendants' opposition brief identifies the problems experienced by the Avanas and the Barragans and argues that there is no abatement necessary or possible. Defendants assert (1) the Avanas' problem involved a spill from a sewer line next to their home caused by tree roots, (2) the tree was removed the same day the spill occurred, and (3) the Avanas experienced no further spills. As to the Barragans, defendants assert they had a problem with their electrical pedestal and this problem did not affect the other tenants.

Despite defendants' specific discussion of the failures to maintain that resulted in liability to the successful plaintiffs and how these failures fit into the jury's other findings, plaintiffs' reply brief made no attempt to present an example of a failure to maintain that (1) also fit with the jury's findings and (2) could have been remedied by an injunction ordering repairs. In effect, plaintiffs have relied on the theoretical possibility of injunctive relief without demonstrating it was a reasonable possibility. This is not simply an oversight by plaintiffs' attorneys. Because the jury explicitly found that there were no substantial failures to maintain as to each unsuccessful plaintiff, none of those plaintiffs need an injunction to alleviate the impact of substantial failure to maintain on them. In short, the substantial failures to maintain involved only the successful plaintiffs and not any of the plaintiffs pursuing this appeal.

Accordingly, based on our examination of the jury findings and the evidence presented, we conclude plaintiffs have not demonstrated prejudice

by showing a reasonable probability that they could have obtained an injunction ordering defendants to repair a public nuisance.[13]

## 4. *Possibility of Recovering Damages Caused by a Public Nuisance*

Plaintiffs also argue the instructional error regarding public nuisance prejudiced them because the jury could have used the "yes" answers in the verdict regarding public nuisance to find a private nuisance and award damages.

We reject this argument regarding prejudice because the answers in the verdict forms regarding public nuisance and private nuisance establish that the unsuccessful plaintiffs were not affected by, and thus could not have experienced any damages from, a substantial failure to maintain.

The special verdict forms dealing with the *private* nuisance claims required the jury to address specifically whether, as to the individual plaintiffs, there was a substantial failure by defendants to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition. The jury found such failures only with respect to the successful plaintiffs. As to the unsuccessful plaintiffs, the jury found no such failures.

The findings that there were no substantial failures to maintain as to the unsuccessful plaintiffs clearly means that the substantial failures to maintain, that caused the jury to answer "yes" to the first question in the special verdict for public nuisance, affected only the successful plaintiffs and did not affect the plaintiffs who lost at trial. It logically follows that the finding of substantial failures to maintain in the special verdict for public nuisance could not have been used by the unsuccessful plaintiffs to obtain damages.

Stated from another perspective, the answers to the questions in the special verdict forms regarding private nuisance provide this court with sufficient information to conclude that the unsuccessful plaintiffs were not affected or damaged by defendants' substantial failure to provide and maintain the physical improvements of the Park and the common facilities in good working order and condition. Indeed, as plaintiffs' counsel pointed out during his closing arguments to the jury, the purpose of the special verdicts regarding private nuisance was to individualize the harm from the substantial failures found in the answers regarding a public nuisance. This purpose was achieved when the jury found that four of the plaintiffs were damaged under

---

[13] Because of our conclusion that plaintiffs have not met their burden to show prejudicial error, we need not address the contention that plaintiffs agreed to the public nuisance instruction and, thus, their challenge is barred by the doctrine of invited error or waiver.

a private nuisance theory and the unsuccessful plaintiffs were not affected by a substantial failure to maintain.

Therefore, the jury would not have awarded monetary damages to the unsuccessful plaintiffs if the jury had been instructed properly on public nuisance under Civil Code section 798.87, subdivision (a). Accordingly, plaintiffs have not established that the instructional error caused prejudice.

## IV. *Jury Instructions Regarding Private Nuisance**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. *Recreational Vehicles and the Park's Rules and Regulations*

■ Plaintiffs contend the trial court committed reversible error in an evidentiary ruling and a jury instruction by misinterpreting the Park's rules to mean Colony Park was allowed to rent spaces for recreational vehicles. In plaintiffs' view, the Park's rules prohibited Colony Park from renting spaces for recreational vehicles. This claim of error requires us to determine whether the Park's rules are ambiguous (i.e., reasonably susceptible to more than one interpretation) on the subject of Colony Park's authority to rent spaces for recreational vehicles. (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554] [the existence of contractual ambiguity is a threshold question to the determination of meaning].)[16]

### A. *Meaning of the Park's Rules*

#### 1. *Contents of the Park's Rules and Regulations*

The controversy regarding the interpretation of the Park's rules involves provisions in the sections labeled "PARK STANDARDS" and "VEHICLES."[17] The park standards stated: "Only mobile homes approved by the Management/Park owner shall be admitted into the Park. Management reserves the right to refuse admission to any mobile home which does not meet park standards, the condition and/or appearance of which is misrepresented or which is not compatible with homes in the park, determined in terms of their size, dimensions, material, quality and condition."

---

*See footnote, *ante*, page 601.

[16] The Park began its operations in the 1970's and, therefore, the restrictions on renting spaces for the accommodation of recreational vehicles that are set forth in Civil Code section 798.22 do not apply in this case. Those restrictions apply to mobilehome parks developed after January 1, 1982.

[17] The Park's rules and regulations were labeled "GUIDELINES TO LIVE BY" and included "PARK STANDARDS" as section IV.A and "VEHICLES" as section V.

Subsequent standards addressed maintenance of the "[e]xterior[] of mobile homes" and the installation of management-approved skirting. None of the standards mentioned recreational vehicles or motor homes.

Motor homes and recreational vehicles were addressed later in section V.2.c of the Park's rules and regulations concerning vehicles: "Campers[,] motor homes[,] recreational vehicles, trailers, boats, etc[.] may not be stored or maintained on lots or driveways[.] Unless space is available in the Park provided storage area[,] Tenant must arrange for storage outside of the Park[.] Vehicles, whether in the storage area or parked at a space may not be used for sleeping[.] Recreational vehicles may be loaded/unloaded at the mobile home space for a period of 2 days before or after a trip."

### 2. *Trial Court's Interpretation*

During plaintiffs' case-in-chief, the trial court considered the meaning of the foregoing provisions of the Park's rules and specifically addressed the argument of plaintiffs' attorney that "only mobile homes" meant nothing else was allowed to be moved into the Park. The court stated: "That only says what mobilehomes are going to be approved by the park. It doesn't say, therefore, there can't be any RVs." The court further explained its interpretation of the Park's rules by stating: "There's nothing that precludes the park in these contracts from renting to RVs. The language is specific as to what mobilehomes they're going to accept or reject into the park, which is consistent with what a mobilehome park would do. There's nothing in here talking about anything about being able to or not able to rent to RVs. It's very clear they can rent to RVs because there's things about for RV storage and what have you that's also contained in the park's rules and regulations."

This statement demonstrates that the trial court decided the Park's rules were not ambiguous. When the trial court reached this conclusion about ambiguity, the only parol evidence before it was the testimony of a few plaintiffs that the Park manager told them that Colony Park would not rent spaces for recreational vehicles. Defendants prevailed on the issue without presenting any parol evidence to support their interpretation.

### 3. *Appellate Review of Ambiguity and Parol Evidence*

■ The standard analysis used to review a trial court's interpretation of a written contract is set forth in *Winet v. Price, supra*, 4 Cal.App.4th 1159 and begins with the threshold question of whether the writing is ambiguous—that is, reasonably susceptible to more than one interpretation. (*Id.* at pp. 1165–1166; see *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 754–755 [106 Cal.Rptr.3d 318].) The inquiry into ambiguity presents a question of law subject to independent review on appeal. (*Winet v. Price*, at p. 1165.)

The analysis of whether an ambiguity exists is not limited to the words of the contract. (*Scheenstra v. California Dairies, Inc., supra*, 213 Cal.App.4th at p. 390.) Trial courts are required to receive provisionally any proffered parol evidence that is relevant[18] to show whether the contractual language is reasonably susceptible to a particular meaning. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641]; *Winet v. Price, supra*, 4 Cal.App.4th at p. 1165.) Such parol evidence might expose a latent ambiguity when the contract appears unambiguous on its face. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra*, at p. 40 & fn. 8.)

Similarly, an appellate court must consider the proffered parol evidence when conducting its independent review into whether an ambiguity exists. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra*, 69 Cal.2d at p. 40 & fn. 8.) In other words, appellate courts evaluate the instrument's language and relevant extrinsic evidence and decide whether, in light of the extrinsic evidence, the language is reasonably susceptible to the competing interpretations urged by the parties. (*Ibid.*)

### 4. *"Only Mobile Homes" Rule*

One sentence in the Park's rules provides: "Only mobile homes approved by the Management/Park owner shall be admitted into the Park." This rule identifies a single type of structure (i.e., "mobile homes approved by the Management/Park owner") that "shall be admitted into the Park." This sentence was drafted as an *authorization*; the Park's rules do not address the "admission" question from the opposite perspective and list the types of structures and vehicles that are *prohibited* from specifically renting a space or being "admitted" into the Park.

We will consider whether it is reasonable to interpret this "only mobile homes" rule as prohibiting the rental of lots to persons intending to live in recreational vehicles, which are not mentioned. This inquiry requires us to consider the meaning of the word "only" and the verb phrase "shall be admitted."

Generally, contractual language is read in its "ordinary and popular sense." (Civ. Code, § 1644.) The ordinary or common meaning of a word often is obtained by courts from dictionary definitions. (E.g., *People ex rel.*

---

[18] Evidence is relevant if it concerns a party's outward manifestation or expression of intent. (*Winet v. Price, supra*, 4 Cal.App.4th at pp. 1165–1166.) "[E]vidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language." (*Id.* at p. 1166, fn. 3.)

*Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1263 [11 Cal.Rptr.3d 317] [courts typically look to dictionaries to determine a word's common meaning].)

 Black's Law Dictionary (5th ed. 1979) defines "only" as "[s]olely; merely; . . . of or by itself; without anything more; exclusive; nothing else or more." (*Id.* at p. 982.) Another dictionary defines the word "only" to mean "without companions or associates" and "alone in an indicated . . . category." (Webster's 3d New Internat. Dict. (1993) p. 1577, col. 1.) Its synonyms include lone, isolated, sole and single. (*Ibid.*) Based on these dictionary definitions, the word "only" is not ambiguous. When a contract says "only A," it means "A and nothing else." The phrase "only A" cannot be construed reasonably to mean "A, B or C." (See *Debary Real Estate Holdings, LLC v. State, Dept. of Business & Professional Regulation, Division of Pari-Mutuel Wagering* (Fla.Dist.Ct.App. 2013) 112 So.3d 157, 166 [statute's use of "only two" means two and not one, three or more]; *Moore v. Stevens* (1925) 90 Fla. 879 [106 So. 901] [requirement that the property "be used for residence purposes only" necessarily excluded all uses of the property that were not residential; a specific prohibition was unnecessary]; *United Parcel Service, Inc. v. Universal Diamond Corp., Inc.* (1991) 200 Ga.App. 794 [409 S.E.2d 558] [no ambiguity in the contractual requirement for "cash only" payment].) Thus, the meaning of the word "only" is clear and explicit. (See Civ. Code, § 1638 [clear and explicit meaning governs interpretation of contract].) We recognize, however, that the use of "only" may render a sentence ambiguous because of uncertainty as to which words or phrases are modified. (See Haggard, *"Only," The Lonely* (1994) 5 S.C. Law. 25 [careless placement of "only" can alter the meaning of a sentence].)

When referring to a place (i.e., a physical location), the word "admit" usually means "to allow entry." (Webster's 3d New Internat. Dict., *supra*, p. 28, col. 2.)

 Therefore, inserting the ordinary meaning of "only" and "admitted," the sentence referring to mobilehomes approved by management would mean that only mobilehomes approved by the Park's management, and nothing else, shall be allowed entry into the Park. This meaning is not a reasonable interpretation because, taken literally, it would prohibit *everything* else (including human beings, cars and pets) from being allowed to enter into the Park. Such an interpretation is unreasonable and absurd because the clear purpose of the Park is to provide its tenants with a place to live. Consequently, our inquiry does not end with the provision regarding park standards. We must consider other provisions in the Park's rules and regulations before deciding if management is unambiguously authorized or prohibited from

renting spaces for recreational vehicles. (See Civ. Code, § 1641 [contract must be read as a whole and, if reasonably practicable, each clause helping to interpret the other].)

### 5. *Provisions Addressing Recreational Vehicles*

Section V.2.c of the Park's rules indicates that recreational vehicles are allowed inside the Park if certain restrictions are followed. One of the broader restrictions states that campers, motor homes and recreational vehicles "may not be stored or maintained on lots or driveways."

Colony Park's petition for rehearing argues that the stored-or-maintained provision is ambiguous because the term "maintained" has many definitions. Colony Park argues the term "maintained" refers to repair work and, therefore, the proper interpretation of the rule is that recreational vehicles may not be *stored or repaired* on lots or driveways. Under this interpretation, Colony Park would not be prevented from renting spaces for recreational vehicles. Colony Park also acknowledges that the rule could be read to mean that recreational vehicles are not to be *stored or kept* on lots or driveways. Based on these two possible ways to read the rule's use of the word "maintained," Colony Park contends the rule is ambiguous and the ambiguity should be resolved on remand.

In *People ex rel. Dept. Pub. Wks. v. Ryan Outdoor Advertising, Inc.* (1974) 39 Cal.App.3d 804 [114 Cal.Rptr. 499], the court referenced dictionary definitions of the verb " 'maintain' " that included " 'to keep or keep up' " and " 'to keep in a certain condition or position, [especially] of efficiency, good repair, etc.' " (*Id.* at p. 810.) Therefore, from an academic or abstract point of view, defendants have shown that the word "maintained" is susceptible to more than one reasonable interpretation. It could have a narrow meaning limited to the performance of repair work or it could mean "to keep in a certain . . . position," which position is identified by the Park's rule as "lots or driveways."

■ Our inquiry into the meaning of the Park's rules goes beyond the abstract—we must consider the language in context and determine if defendants have proposed a reasonable interpretation of the Park's rules. (See *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] [instrument's language cannot be found to be ambiguous in the abstract; it must be construed in context]; Civ. Code, § 1641 [whole of a contract is to be taken together].)

In resolving the threshold legal question about whether the stored-or-maintained provision is ambiguous, we must determine whether the provision

is reasonably susceptible to the interpretation presented in Colony Park's petition for rehearing. (See *Winet v. Price, supra*, 4 Cal.App.4th at p. 1165 [the existence of ambiguity is a threshold legal question].) We conclude that defendants' interpretation is not reasonable when viewed in context. Interpreting the provision to prohibit repair work would mean that someone renting a lot would be allowed to place a recreational vehicle on the lot, hook it up to the utilities, and live in the recreational vehicle, yet would not be allowed to perform any repair work on the recreational vehicle. Consequently, if the recreational vehicle was damaged while on the lot, the repairs would have to be performed somewhere other than the Park to avoid violating the Park's rules as interpreted by defendants. For example, if a door was caught by the wind and its hinges bent, the door could hang askew without violating defendants' no-repair interpretation but the door could not be fixed without violating the no-repair interpretation. Another example is provided by applying defendants' no-repair interpretation to a situation where a recreational vehicle's tires went flat. The unfortunate renter, prohibited from doing any repair work on the lot, would have to drive or haul the recreational vehicle out of the Park on its rims before undertaking any repairs. These examples about how defendants' interpretation would operate lead us to conclude that defendants' interpretation of the Park's rules is not reasonable. Therefore, we conclude the only reasonable interpretation of "maintained" as used in the rule that states a recreational vehicle may not be stored or maintained on a lot or driveway is that the recreational vehicle may not be physically placed or kept in position on a lot or driveway, whether for use as living quarters, for purposes of repair, or for storage purposes.

&#9608; We also note that the stored-or-maintained provision does not identify *who* is subject to the prohibition. This failure to identify who is subject to the rule does not create an ambiguity because Civil Code section 798.23, subdivision (a) provides that the park owner and its employees "shall be subject to, and comply with, all park rules and regulations, to the same extent as residents and their guests." Based on this statute, neither the owner nor a resident would be allowed to place a recreational vehicle on a lot for use as living quarters.[19]

The critical question is whether this prohibition against maintaining recreational vehicles on a lot also operates as a *restriction on management's authority to rent lots*. In other words, does management have the authority to rent a lot to someone who intends to live on that lot in a recreational vehicle?

---

[19] To illustrate the rule's application to the owner, it would prohibit the owner from placing a recreational vehicle on a lot and offering it as a residence to an onsite employee of the park, such as a maintenance worker or park manager.

We conclude that the only reasonable interpretation of the Park's rules is that management is not authorized to rent lots to persons who intend to live on those lots in recreational vehicles. In short, it does not make sense to interpret the Park's rules to *allow* management to rent lots to persons who intend to live in recreational vehicles when the Park's rules prohibit the renter from using the lot for that purpose. Stated another way, the Park's rules are not reasonably susceptible to an interpretation that allows Colony Park to rent spaces for recreational vehicles.

Our conclusion that the interpretation presented by Colony Park and adopted by the trial court is not reasonable leads us to conclude that the Park's rules are not ambiguous—that is, reasonably susceptible to more than one interpretation. (See *Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265 [language in a contract must be construed in the context of that instrument as a whole and the circumstances of the case; language cannot be found to be ambiguous in the abstract]; Civ. Code, § 1641 [whole of a contract is to be taken together].)

Our interpretation of the Park's rules is consistent with the other require-ments that apply to recreational vehicles. For instance, recreational vehicles can be placed in the Park-provided storage area or storage outside the Park, but are allowed to be loaded or unloaded at the mobilehome space for two days before or after a trip. Furthermore, whether in storage or parked at a space, the recreational vehicle may not be used for sleeping. These rules do not imply that management has the authority to rent spaces to a person who intends to live on the lot in a recreational vehicle.

Lastly, our interpretation of the text of the Park's rules is supported by the parol evidence presented—namely, testimony by some of the plaintiffs that management informed them that Colony Park would not rent spaces for recreational vehicles.

### 6. *Summary*

First, the Park's rules are not facially ambiguous on the question whether Colony Park is allowed to rent spaces for recreational vehicles. Second, the parol evidence in the record that is relevant to the interpretation of the Park's rules does not support the existence of a latent ambiguity in the Park's rules. Therefore, we conclude that when the text of the Park's rules is read as a whole in light of the relevant parol evidence received, the only reasonable interpretation of the Park's rules is that Colony Park is not authorized to rent spaces for recreational vehicles.

This interpretation, however, is not final for all purposes. Defendants did not have the opportunity to present parol evidence and, if given that

opportunity, might be able to present relevant parol evidence that creates "a latent ambiguity whe[re] the contract appears unambiguous on its face." (*Scheenstra v. California Dairies, Inc., supra*, 213 Cal.App.4th at p. 390.) Consequently, defendants shall be given that opportunity on remand.

B.–E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VI., VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The amended judgment filed on February 7, 2012, is reversed in part as follows.

Paragraphs Nos. 1 and 7 are vacated as to the 68 unsuccessful plaintiffs and shall remain in effect as to the six successful plaintiffs (i.e., the Avanas, the Barragans and the Cermenos) and the eight plaintiffs who were dismissed as a terminating sanction (i.e., Tina Beard, Michael Cooper, Terri Cooper, Billy Gann, Rodney Johnston, Charles Sammons, Melinda Sue Sammons, and the Estate of Oletha Singleton).

Paragraph No. 2 is vacated in its entirety.

Subparagraphs Nos. 6.a and 6.b, which concern the award of attorney fees and costs against the 68 unsuccessful plaintiffs who went to trial and obtained no net monetary recovery, are vacated.

Also vacated are the parts of the amended judgment that set forth the jury's answers to (1) question No. 2 in the special verdict for public nuisance; (2) question No. 1 in the special verdicts for the individual plaintiffs, which addressed whether defendants breached their contract with that particular plaintiff; and (3) question No. 5 in the special verdicts for the individual plaintiffs, which addressed whether there was a substantial violation of the Park's rules as to that particular plaintiff. The further proceedings conducted after remand will resolve the issues presented in these questions as to the 63 plaintiffs who filed this appeal.

---

*See footnote, *ante*, page 601.

The matter is remanded to the trial court for further proceedings not inconsistent with this opinion, including without limitation the discussion of remand in part V.E. and the discussion in part VII., which are not certified for publication.

Any future judgment entered in this matter, besides setting forth the results of the further proceedings, shall put into final effect (i) the jury's answers in the special verdicts for Darlene Henslee, John Pierce and Elzina Wortell; (ii) the order granting nonsuit against the Estate of Nancy Faughn and the Estate of Walter Faughn; and (iii) the prior disposition of the claim for intentional interference with property rights.

The parties shall bear their own costs on appeal.

Poochigian, Acting P. J., and Peña, J., concurred.